## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **MICHAEL PERRY, et al.,** ) | |
|     **Plaintiffs and** ) | |
|     **Defendants-in-Counterclaim,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **FEDERAL DEPOSIT INSURANCE** ) | |
| **CORPORATION, in its capacity as Receiver/** ) | |
| **Liquidating Agent for Capitol Bank Trust** ) | |
| **Company,** ) | |
|     **Defendant,** ) | **Civil Action No. 08cv11054-NG** |
| ) | |
|     **and,** ) | |
| ) | |
| **AMERICAN FIRST FEDERAL, INC., by and** ) | |
| **through its Servicing Agent FIRST** ) | |
| **COMMERCE, LLC,** ) | |
|     **Defendant and** ) | |
|     **Plaintiff-in-Counterclaim,** ) | |
| ) | |
|     **and,** ) | |
| ) | |
| **JOY C. PERRY, et al.,** ) | |
|     **Interested Parties and** ) | |
|     **Third Party Defendants.** ) | |

**GERTNER, D.J.**

### MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT
December 21, 2010

    This dispute arises out of a Settlement Agreement between the plaintiffs and interested

parties (collectively "the Perry Parties") and the Federal Deposit Insurance Corporation

("FDIC") designed to resolve previous disputes before this Court.  See dockets 97-12698NG and

99-12194NG.  As part of the Settlement Agreement on June 20, 2005, the Perry Parties agreed to

pay $2 million to the FDIC and an additional $4.625 million within two years.  See Settlement

Agreement at 2 (document #1-5).  The Perry Parties defaulted on this latter payment, and the

FDIC allowed them to forebear for a limited time. The FDIC eventually sold the debt and file to American First Federal, Inc. ("AFFI"), who attempted to collect.

The Perry Parties subsequently filed suit against the FDIC and AFFI in Norfolk Superior Court for breach of contract, fraud, misrepresentation and deceit, and for a declaration of the rights of third parties. Compl. (document #1). AFFI removed to this Court and counterclaimed against the Perry Parties for breach of the original settlement agreement; fraud; misrepresentation and deceit; waste; unfair and deceptive trade practices; declaratory judgment; and violation of M.G.L. 231 §6F. <u>See</u> Def.'s Answer, Countercl., and Third Party Compl. (document #26). The FDIC filed a Motion for Judgment on the Pleadings(document #49), which I granted in an electronic order on November 2, 2010.

This memorandum addresses two Motions for Summary Judgment filed by AFFI. <u>See</u> Def.'s Mot. Partial Summ. J. (document #54); and Def's Mot. Summ. J. (document #63). After a hearing, I **GRANT** the Motion for Partial Summary Judgment and **GRANT in part and DENY in part** Defendant's Motion for Summary Judgment, for the reasons that follow.

## I. FACTUAL BACKGROUND

In a motion for summary judgment, I am to construe facts in the light most favorable to the non-moving party. Here, I include those facts that are undisputed. It is worth noting, however, that the plaintiffs argue that the record suggests the FDIC agreed to forbear enforcement of the debt they owed indefinitely. I need not accept this farfetched interpretation. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

## A.    The Settlement Agreement

On or about June 20, 2005, the FDIC, as liquidating Agent/Receivor of Capitol Bank and Trust Company, entered into a Settlement Agreement with the plaintiffs and interested parties in this current action.  Settlement Agreement (document #1-5).

### 1.    Parties

The Settlement Agreement begins by defining the parties and the purpose of the Agreement:

> Michael Perry ("Perry") and Joy C. Perry ("Mrs. Perry") (collectively "the Perry's"), and the Perry Parties, consisting of: the Perrys; Michael Perry as Trustee of Allston Townhouse Realty Trust, Berry Realty Trust, Criterion Realty Trust, 54 Egmont Realty Trust, Fenmore Realty Trust, Heights Realty Trust, Hillcrest Development Trust, Reservoir Manor Realty Trust, Triple Play Realty Trust, Zenith Realty Trust, Brighton Acquisition Realty Trust and Argus Realty Trust; Allyson Perry, both individually and as Trustee of Perry Family Realty Trust, Rebecca Realty Trust, Sarah Realty Trust, Village Realty Trust, School Street Realty Trust, JARS Realty Trust and 1400 Beacon Realty Trust; Bruce Linsky; Mark Linsky; Brighton Condominium Partnership; Condominium Housing, Inc.; C.H. Mortgage Company, Inc.; Windsor Realty Development Corp.; Windsor Mortgage Company, Inc.; Windsor Fax-Tele, Inc.; AMN Corporation; Beacon Holdings, Inc.; William Way Corp.; Boylston Acquisitions LLC; Economy Mortgage, Inc.; Rugg Corporation; Framingham Acquisitions LLC; and One Hundred Twenty Acquisitions LLC, hereby enter into this agreement (the "Settlement Agreement") with the Federal Deposit Insurance Corporation ("FDIC") as Liquidating Agent/Receivor of Capitol Bank and Trust Company ("Capitol Bank"), in order to resolve all disputes between the FDIC and the Perry Parties, upon the following terms.

Id. at 1(document #1-5).

Each of these entities signed the Settlement Agreement individually, apart from Herta

Linsky, who was deceased at the time of signing.  Id. at 9-10.  Every one of the "Perry Parties"

or entities are controlled by the Perrys; a member of the Perry family signed for each.  Michael

Perry signed for thirteen parties, and his daughter, Allyson Perry signed for eight.  Id.

The Agreement refers to the "Perrys" for Mr. and Mrs. Perry and "the Perry Parties" for

all of the parties listed.  The Agreement states that the Perry Parties are together liable for the

debt:

> The Perry Parties shall pay to the FDIC the sum of Six
> Million Six Hundred Twenty-Five Thousand Dollars
> ($6,625,000.00) (the "Settlement Amount"), plus interest . .
> . Contemporaneously with their execution of the Settlement
> Agreement, the Perry Parties shall pay to the FDIC an
> initial payment of Two Million Dollars ($2,000,000.00)
> (the "Perry Deposit"), which shall be credited against the
> Settlement Account. . . Within two (2) years after the date
> of the Settlement Agreement, the Perry Parties shall pay to
> the FDIC additional sums totaling Four Million Six
> Hundred Twenty-Five Thousand Dollars ($4,625,000.00),
> plus accrued interest (together, the "Additional Perry
> Payments").

Id. at 2.  And in the event of default, the FDIC could recover from any or all of them:

> Upon the occurrence of any Event of Default by the Perry Parties,
> the FDIC, whether or not it chooses to exercise its rights under the
> Optional Security Documents and the Other Security Documents,
> may commence legal proceedings to enforce the Settlement
> Agreement and **to collect from any or all of the Perry Parties
> any portion of the Settlement Amount that remains unpaid.**

Id. at 6 (emphasis added).

## 2.    Security Properties

The Settlement Agreement required, and the Perry Parties indeed delivered, additional security in the form of two mortgages for I) 15-19 North Main Street, Bellingham, Massachusetts ("Bellingham Plaza"), from Beacon Holdings, Inc.; and ii) 300 Canal Street, Lawrence Massachusetts ("300 Canal"), from Pacific Mills LLC.  The mortgage documents for these two properties were attached to the Settlement Agreement as Exhibit B and Exhibit C respectively.  Id. at 3.  Allyson Perry, one of the Perry Parties herself, signed the Mortgage on 300 Canal Street as Manager of Pacific Mills, and the Mortgage on Bellingham Plaza as President of Beacon Holdings.  See Mortgages, June 20, 2005 (document #1-5).

As "optional security" to reduce the original deposit, the Perry Parties were allowed to produce a mortgage on their property at 516 Green Street, which they did.  Again, Allyson Perry signed the mortgage as Manager of First Cambridge Green Acquisition.

The Perry Parties made a series of representations about the properties in the Settlement Agreement, including *inter alia*, that "300 Canal is subject to the Canal Assignment but not encumbered by any other liens" and that

> to the extent that the real property at 300 Canal has any oil contamination, hazardous waste or other hazardous materials located thereon or therein, such as oil contamination, hazardous waste or other hazardous materials does not materially affect the value of the real estate.

Settlement Agreement at 3-4 (document #1-5).

The Perry Parties were required to maintain these properties in good condition, manage the properties reasonably, pay real estate taxes, and keep current all of the obligations.  They were not to increase the outstanding principal balance on any of the existing mortgages.  And

they were not to "permit any further encumbrances to be placed on 300 Canal, Bellingham Plaza, or 516 Green, and forthwith take all steps necessary to remove or dissolve any involuntary lien placed upon any of those properties." Id. at 4. The Agreement further noted:

> The FDIC understands that the Perry Parties are considering granting a mortgage to Raymond C. Green, Inc. and Rodman Financial Group in exchange for a discharge of the Canal Assignment as security for the indebtedness presently secured by the Canal Assignment. So long as any new mortgage does not increase the amount of the lien represented by the Canal Assignment, the FDIC has no objection to the substitution of such a mortgage for the Canal Assignment and will agree to subordinate to that new mortgage the mortgage being granted to the FDIC on 300 Canal.

Id. at 4.

### 3. General Provisions

Finally, the Settlement Agreement included the following general provisions:

> F. Where written notice is required to be given to any one or more of the Perry Parties, the requirement may be satisfied by giving written notice to Matthew H. Feinberg of Feinberg & Kamholtz . . .
>
> G. The Settlement Agreement reflects the entire agreement of the parties . . . and is to be governed by federal law to the extent applicable, and otherwise by Massachusetts law.
>
> H. Any legal proceedings relating to or arising out of the Settlement Agreement shall be brought in the United States District Court for the District of Massachusetts in Boston.

. . .

> K. Any modification of the terms of the Settlement Agreement, including any modification of the deadlines set forth herein, may be made only by written agreements of the parties or their counsel.

Id. at 8-9.

**B.    Default & Forbearance**

Under the Settlement Agreement, the Perry Parties were due to pay an additional sum of $4,625,000 by June 20, 2007.  Id. at 2.  The Perry Parties failed to pay and thus defaulted on the debt.  See Compl. ¶ 1.  In fact, they have not paid the debt to date.

As part of their complaint, the plaintiffs included the correspondence between counsel after this default.  In these letters, the FDIC agreed to forbear enforcement of the Settlement Agreement for a limited period of time.  The current dispute arises in part out of the letters detailed here:

Plaintiff's attorney Michael Magerer wrote to Alan Fryer, the attorney for the FDIC, on June 20 to confirm that his client was not able to make payment.  He explained that "due to unforeseen circumstances, certain transactions, which were expected to provide the amount(s) necessary to fund the settlement payment, have not come to fruition."  Letter from Michael Magerer to R. Alan Fryer, June 20, 2007 (document #1-6).  He requested an extension of time and offered to provide documents relating to the transactions in which his client was involved, including offers, purchase and sales agreements, and expected proceeds, presumably to show that his client would be able to produce the sum soon.  Id.

The parties corresponded in three sets of subsequent letters, outlining the terms of a possible forbearance agreement.  In its fourth letter, the FDIC through counsel made a final offer.  To induce the FDIC to forbear enforcement of the debt, Mr. Perry would have to do three things:

> I) explain the steps he was taking to raise the funds as well as a date by
> which he would be able to raise them;

ii) agree to increase the rate of interest from four percent to eight percent, beginning June 21, 2007; and

iii) finally:

> [F]or each thirty days that Mr. Perry wishes to extend the payment deadline, **up to a maximum of ninety days**, Mr. Perry must pay the FDIC an additional $10,000 in advance.  If Mr. Perry is able to reduce the principal balance by at least $1,000,000 during a given 30-day period, the $10,000 paid for that 30-day extension will be credited to principal.  In other words, if Mr. Perry wishes to be granted three 30-day extensions (for a total of 90 days), he must pay $30,000.  The FDIC is willing to make the following modification: rather than paying the entire $30,000 now, he must pay $20,000 now in order to obtain two 30-day extensions and ay pay another $10,000 on or before August 20, 2007 to obtain an additional 30-day extension.

Letter from R. Alan Fryer to Michael Magerer, July 11, 2007 (document #1-6) (emphasis added).

Mr. Magerer responded on July 13, 2007, accepting FDIC's proposal.  He detailed his client's efforts to raise funds to satisfy the Settlement Agreement.  His client agreed to "increase the Settlement Agreement interest rate from four percent to eight percent per annum.  The change in the rate will be effective beginning June 21, 2007."  And he incorporated the third requirement in Mr. Fryer's July 11, 2007, letter.  He stated that his client would provide a check for $20,000.  Letter from Michael Magerer to R. Alan Fryer, July 13, 2007 (document #1-6).  Indeed, Mr. Perry did provide that check on July 17, 2007.  The check for $20,000 was signed by another one of his holding companies, the Windsor Management Company.  See Copy of Check, from Windsor Management Company to FDIC as Liquidating Agent Receiver of Capital Bank & Trust Company (document #1-6).

No separate forbearance agreement was ever provided by the FDIC.  In one letter, Mr.

Magerer asked whether the letters would constitute an agreement or whether the FDIC would

provide an additional written forbearance agreement.  In any case, he stated that his client

intended to be bound by the letter.  Letter from Michael Magerer to R. Alan Fryer, July 13, 2007

(document #1-6).  Mr. Fryer never responded to this question in subsequent correspondence, but

he did refer to Mr. Perry's arrangement with the FDIC as an agreement:

> In other words, **the agreement** that Mr. Perry has just
> entered into with the FDIC is not an "extension" of the
> Settlement Agreement in any way, shape or form.  Mr.
> Perry remains in default.  The FDIC has simply agreed to
> forbear enforcement of the remedies available to it for a
> **limited period of time**.

Letter from R. Alan Fryer to Michael Magerer, July 23, 2007 (document #1-6) (emphasis added).

The letters note the FDIC's frustration with the Perry Parties and state on several

occasions that the Perry Parties are in default.  <u>See</u> letter from R. Alan Fryer to Michael Magerer,

June 21, 2007 (document #1-6) ("Mr. Perry's failure to pay was an 'event of default,' as defined

in Section V of the [Settlement] Agreement."); Letter from R. Alan Fryer to Michael Magerer,

June 23, 2007 (document #1-6) ("Mr. Perry obviously knew the terms of the settlement. . . .

Nevertheless, Mr. Perry consciously chose to leave the FDIC in the dark, giving it no reason to

expect that he would do anything other than meet his obligations under the Settlement

Agreement.  As a result, Mr. Perry's failure to make the required payment was not only a serious

breach of the agreement and an event of default; it was also a very unpleasant surprise to the

FDIC.")

Under the contours of the forbearance agreement outlined in the letters, Mr. Perry paid

$20,000 to secure an additional 60 days to pay the debt.  He would be allowed to pay an

additional $10,000 on or before August 19, 2007, for one final 30 day extension.  No letters or affidavits provided to this Court indicate that the FDIC intended to agree to forbear on the loan after these 90 days.

Indeed, on August 15, Mr. Fryer wrote to Mr. Magerer and reminded him that payment was due (now $5,119,847.80 with interest), or in the alternative, Mr. Perry could pay an additional $10,000 to extend the deadline and provide a "detailed explanation of his fund-raising efforts."  Letter from R. Alan Fryer to Michael Magerer, Aug. 15, 2007 (document #1-6).  Mr. Perry provided another check, again signed by Windsor Management Company, for $10,000 on August 17, 2007.  See Copy of Check, Windsor Management Company to the order of FDIC as Liquidating Agent Receiver of Capital Bank & Trust Company, Aug. 17, 2007 (document #1-6).

Finally, Mr. Fryer wrote to Mr. Magerer on September 12, 2007, reminding him that the FDIC had "agreed to suspend enforcement of its remedies under the Settlement Agreement for an additional thirty days, to September 19, 2007" and that the full balance of the debt (now $5,150,569.10) was due.  See Letter from R. Alan Fryer to Michael Magerer, Sept. 12, 2007 (document #1-6).  This final letter did not provide an option for additional extension.

Mr. Magerer responded to Mr. Fryer on September 20, 2007 that his client still could not pay the debt.  Mr. Magerer provided extensive details about Mr. Perry's current business dealings, including developments at the properties listed as securities in the Settlement Agreement.  The letter states that this information is provided "I) . . . for informational purposes only and to substantiate that [his] client is acting in good faith . . . ; and ii) that [FDIC] will not interfere with any such transactions while they are pending."  Letter from Michael Magerer to R. Alan Fryer, Sept. 20, 2007, at 6 (document #1-7).  The letter further beseeched the FDIC to

allow the Perrys additional time.  The matter, he claimed, was taking an emotional toll on the

Perrys, who wanted to comply with the Agreement and pay the debt.  If, however, the matter

could not be resolved, Mr. Magerer wrote that his client would pursue bankruptcy: "Regardless

of why my client has not filed in the past, if we are unable to resolve this situation, at that point,

those 'barriers' will be no more and he will have no choice." Id. at 7.

### C.    Aftermath

In the months that followed, the FDIC sought additional information from the Perry's,

including tax returns and financial statements.  See letter from Michael Magerer to R. Alan

Fryer, Jan. 25, 2008 (document #1-8).  It ordered appraisals of both 300 Canal Street and

Bellingham Plaza.  On January 25, 2008, Fryer wrote again to Magerer and stated that the FDIC

> only agreed to delay for three months its efforts to seek recourse for your
> clients' breach of the settlement agreement.  That agreement has long
> since expired.  The FDIC is not prepared to wait indefinitely.  Your clients
> must make a concrete proposal now for paying the balance due under the
> settlement agreement within a reasonable time.  If they fail to do so, the
> FDIC is prepared to pursue its legal remedies.

Id.  He included a draft complaint, naming the plaintiffs and interested parties in this current

action as defendants.  Id.

Mr. Perry continued to default and failed to pay any additional sums to the FDIC.  Three

months later, on March 28, 2008, he received a letter from First Commerce, LLC, servicing

agent to American First Federal, Inc. (AFFI), which stated that it had purchased the loan and

mortgages from the FDIC; they demanded payment and threatened foreclosure on the properties

offered as security in the Settlement Agreement.  As part of the assignment, the FDIC had turned

over the entire file, including the financial information and discussion of Mr. Perry's business

transactions that had been provided to the FDIC to allow them to continue to forbear.

## II.    ANALYSIS

### A.    Standard of Review

"Summary judgment is appropriate only if there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law." Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 87 (1st Cir. 2005).  This case is primarily about the obligations of the various parties under the Settlement Agreement, and contract interpretation questions are questions of law for the court.  Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 9 (1st Cir. 2006).  The court should interpret a contract as a whole according to its plain meaning and the circumstances in which it was entered.  McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 298 (1st Cir. 2004).

As a general rule, an unambiguous contract will be enforced according to its terms. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).  Even where a contract appears ambiguous, however,  the court may enter judgment against a party if its interpretation is "inherently unreasonable when placed in context."  McAdams, 391 F.3d at 298.  A judge does not leave her common sense at the door.  See Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.")

This case arises out of the Settlement Agreement, its breach, and the subsequent representations between and among the parties about the eventual payment of the debt.  In this case, I will interpret the Settlement Agreement according to its terms, context and common sense.  See Teragram, 444 F.3d at 9.  Note that the parties have also brought claims against one another for fraud, deceit, and unfair trade practices.  I will treat these claims in due course, but I

note briefly here that a breach of contract -- even if egregious -- does not necessarily amount to fraud or malfeasance.

AFFI has filed for summary judgment on all of the remaining claims, including the plaintiff's claims against AFFI:

    a.      Count III (Request for Declaratory Judgment about Pacific Mills); and,

    b.      Count IV (Request for Declaratory Judgment about Interested Parties);

    c.

and AFFI's Counterclaims against Plaintiffs and Third Party Defendants (the other Perry Parties):

    d.      Count I (Breach of Contract);

    e.      Count II (Fraud, Deceit and Misrepresentation);

    f.      Count III (Waste);

    g.      Count IV (Unfair and Deceptive Trade Practices);

    h.      Count V (Declaratory Judgment); and

    i.      Count VI (MGL c. 231 s. 6F).

    j.

I will consider each count in turn.

### B.    Declaratory Judgment about Pacific Mills Mortgage (Pl.'s Count III; Def.'s Count V)

AFFI moves for Summary Judgment on the counts seeking a declaratory judgment about the Pacific Mortgage that was offered as security in the Settlement Agreement. <u>See</u> Compl. Count III (document #1-5); AFFI Countercl. Count V (document #26); and AFFI Mot. Partial Summ. J. (document # 55). The plaintiffs argue that because Pacific Mills LLC was not a party to the Settlement Agreement, it could not legally offer a mortgage on its property at 300 Canal Street as part of that agreement. The mortgage, they allege, is therefore null and void. I disagree.

In addition to reading a contract for its plain reading, a judge must interpret a contract such that the contract terms are not rendered meaningless. <u>Summit Packaging Sys., Inc. v. Kenyon & Kenyon</u>, 273 F.3d 9, 12-13 (1st Cir. 2001). In the instant case, the Perry Parties'

proposed construction would render the security provisions of the Settlement Agreement null and void. The Agreement itself, however, is unambiguous. As security for the $4.625 million that they owed FDIC, the Perry Parties offered their property at 300 Canal Street in Lawrence, MA. See Settlement Agreement at 3 (document #1-5). Attached to the Settlement Agreement was a mortgage signed by Allyson Perry as Manager of Pacific Mills. See Mortgage, June 20, 2005 (document #1-5).

It is beyond dispute that the Perry Parties intended these mortgages to be part and parcel of the Settlement Agreement. Although Pacific Mills was not a party to the original case, it became a party to the Settlement Agreement by offering the mortgage. See Baybank Middlesex v. 1200 Beacon Properties, Inc., 760 F. Supp. 957, 963 (D. Mass. 1991) (loan agreement and mortgage, executed contemporaneously, must be construed together to determine the terms of the contract between the parties). The Settlement Agreement is a separate and distinct contract and must be evaluated according to basic contract principles.

The first question, then, is whether as to Pacific Mills the Settlement Agreement is a valid agreement for consideration. See Tirell v. Anderson, 244 Mass. 200, 203 (1923). Perry could argue that there was no consideration for the mortgage offered by Pacific Mills, and as such it was an unenforceable unilateral promise. The requirement for consideration, however, is satisfied if there is either a benefit to the promisor (Pacific Mills) or a detriment to the promisee (FDIC). See Marine Contractors Co. v. Hurley, 365 Mass. 280, 286 (1974). And consideration does not necessarily have to flow from the promisee to the promisor. Id. Here, FDIC's promise to release Perry from further legal proceedings -- to the FDIC's detriment -- is valid consideration in exchange for this mortgage.

The second question is whether the agent who signed the mortgage, Allyson Perry, had authority to bind Pacific Mills. And the unequivocal answer is yes. Allyson Perry is listed on Pacific Mills filings as the Manager and Agent for service of process. Specifically, the 2005 Annual Report filed with the Commonwealth of Massachusetts states, "At this time, Allyson J. Perry is authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property, whether to be recorded with a Registry of Deeds or with a district office of the Land Court." 2005 Annual Report of LLC, Apr. 27, 2005 (document #56-3). Therefore, Allyson Perry, in her capacity as Manager, was authorized to grant the mortgage to the FDIC as part of the Settlement Agreement.

The context of the agreement supports this conclusion. Pacific Mills offered the mortgage to protect Mr. Perry from further legal action by the FDIC because the Perry Parties owned and controlled Pacific Mills. Specifically, Mrs. Joy Perry owns all of Pacific Mills. See Pl's Resp. Statement of Material Facts ¶ 16 (document #76). As Mr. Perry was attempting to induce the FDIC to continue to forbear enforcement of his debt, he made numerous statements about the financial standing of Pacific Mills, confirming that he controlled the entity. See, e.g., Letter from Michael Magerer to R. Alan Fryer, July 13, 2007 (document #1-6). He has not until now claimed that he had no authority to offer the mortgage as security or that the mortgage was void.

I therefore **GRANT** the Defendant's Motion for Partial Summary Judgment (document #54) and declare that the Pacific Mills mortgage is valid as part and parcel of the Settlement Agreement.

**C.    Declaratory Judgment for Third Parties** (Pl's Count IV)

Next, the Plaintiffs argue that the interested third parties -- or all of the other Perry Parties listed in the Settlement Agreement -- did not intend to become joint and severally liable for the debt listed.  They argue that the Settlement Agreement is ambiguous about their financial responsibility and who is meant by the term "the Perry Parties," in part because the agreement does not place the Perry Parties in quotation marks as it does with names that are abbreviated.[1]

Obviously a judge must bring her common sense to bear in her evaluation of the plain meaning of a contract.  See Fishman, 247 F.3d at 302.  And common sense here leads to but one conclusion: *All* of the Perry Parties are joint and severally liable for the debt.  The plain language of the agreement is abundantly clear about who the Perry Parties are and what is required of them. It does not confuse terms or use "Perrys" and "the Perry Parties" interchangeably.  It says:

> **The Perry Parties** shall pay to the FDIC the sum of Six Million Six Hundred Twenty-Five Thousand Dollars ($6,625,000.00) (the "Settlement Amount"), plus interest . . . Contemporaneously with their execution of the Settlement Agreement, the **Perry Parties** shall pay to the FDIC an initial payment of Two Million Dollars ($2,000,000.00) (the "Perry Deposit"), which shall be credited against the Settlement Account. . . Within two (2) years after the date of the Settlement Agreement, the **Perry Parties** shall pay to the FDIC additional sums totaling Four Million Six Hundred Twenty-Five Thousand Dollars ($4,625,000.00), plus accrued interest (together, the "Additional Perry Payments").

Id. at 2 (emphasis added).

Mr. Perry alleges that the FDIC only intended to recover from him and therefore that the other parties were not actual parties to the Settlement Agreement.  Indeed, when Mr. Perry defaulted, the FDIC communicated directly with him through his counsel.  To be sure, the FDIC -

---

[1] The Agreement begins: "Michael Perry ("Perry") and Joy C. Perry ("Mrs. Perry") (collectively, the "Perrys"), and the Perry Parties, consisting of: . . ."  Settlement Agreement at 1 (document #1-5).

- and Mr. Perry -- intended that Mr. Perry would fulfil the obligation and make payment of $4.625 million by the deadline. But the Settlement Agreement was executed by all of these third party entities and provided that should Mr. Perry *fail* to make this payment, the FDIC could recover from any or all of the Perry Parties:

> Upon the occurrence of any Event of Default by the Perry Parties, the FDIC, whether or not it chooses to exercise its rights under the Optional Security Documents and the Other Security Documents, may commence legal proceedings to enforce the Settlement Agreement and **to collect from any or all of the Perry Parties any portion of the Settlement Amount that remains unpaid.**

Id. at 6 (emphasis added). Indeed, that is why the agreement is enforceable against the other Perry Parties, just as a guarantee is enforceable against guarantors of a debt where the debtor fails to pay.

These terms mean what they say: That the Perry Parties are jointly and severally liable for the entire $6.625 million. The Perry Parties are sophisticated business people who were represented by counsel at the time of this agreement's execution. Cheschi v. Boston Edison Co., 39 Mass. App. Ct. 133, 141-42 (1995) (A contract that is the product of bargaining between sophisticated parties will be enforced according to customary rules of contract interpretation). Their agreement to be liable for this sum was given for the valid consideration of the discharge of the FDIC's claims against Mr. Perry, their principle, and themselves as Reach and Apply Defendants. This Settlement Agreement, therefore, is a valid contract, executed by all the interested parties and must be enforced. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992) (It is "elementary that an unambiguous agreement must be enforced according to its terms.") Accordingly, AFFI has the right to collect from any or all of the Perry Parties.

I **GRANT** Summary Judgment for AFFI on Plaintiff's Count IV.

### D.    Breach of Contract -- Failure to Pay (Def's Counterclaim Count I)

AFFI has brought a counterclaim against the plaintiffs and interested parties (altogether "the Perry Parties") for breach of the Settlement Agreement.  To prevail on summary judgment for breach of contract, AFFI must show that there is no triable issue of fact and that they are entitled to judgment as a matter of law.  Here, they must prove I) that there was a valid agreement with consideration; ii) that they were willing and able to perform; iii) that the defendants failed to perform; and iv) that their breach caused damage to AFFI.  See Tirell v. Anderson, 244 Mass. 200, 203 (1923).  In this case, it is clear that the Settlement Agreement was a valid agreement for consideration -- namely the release of the parties from the current litigation -- and that the FDIC had performed its end of the bargain.  The question then is whether the Perry Parties breached the agreement.

I find that the Perry Parties breached the Settlement Agreement when they failed to deliver $4.625 million to the FDIC on June 20, 2007.  It is true that the FDIC agreed to forbear enforcement of the debt for a limited period of time, but the Perry Parties now allege that this forbearance amounted to an amendment of the original agreement.  When they failed to pay, they argue, they were not in default because the debt was in forbearance.  A plain reading of the letters between counsel outlining the terms of the forbearance, however, reveals the opposite:

> [T]he agreement that Mr. Perry has just entered into with the FDIC
> is not an "extension" of the Settlement Agreement in any way,
> shape or form.  Mr. Perry remains in default.  The FDIC has simply
> agreed to forbear enforcement of the remedies available to it for a
> limited period of time.

Letter from R. Alan Fryer to Michael Magerer, July 23, 2007 (document #1-6) (emphasis added).

Accordingly, I find as a matter of law that the Perry Parties breached the Settlement Agreement by defaulting on the amount owed. Any subsequent forbearance period has now passed, and the Perry Parties remain in default. Their breach has caused damage to the FDIC and now AFFI. AFFI, who rightfully assumed the rights to the Settlement Agreement, is entitled to enforce it. Therefore, AFFI's Motion for Summary Judgment on its Counterclaim Count I for breach of contract is **GRANTED**.

### E. Mortgage and Liens on 300 Canal Street: Breach of Contract; Fraud, Misrepresentation & Deceit; and Unfair and Deceptive Trade Practices Act (Def's Counterclaims I-IV)

AFFI further alleges that the Perry Parties not only breached the Agreement, but that they committed fraud, misrepresentation, deceit and waste; and that they violated the Unfair and Deceptive Trade Practices Act. These allegations of intentional wrongdoing, however, are based on facts that are in dispute.

The accusations revolve around the security property at 300 Canal Street. The 300 Canal Street property, at the time of the Settlement Agreement, was subject to one encumbrance: a Canal Assignment that was alleged to be no more than $400,000. The Perry Parties represented, as part of the Settlement Agreement, that they were considering securing a mortgage to replace the Canal Assignment but that that mortgage would not exceed this amount. See Settlement Agreement at 4 (document #1-5). AFFI now claims that the Perry Parties knowingly misrepresented these facts and substituted the Canal Assignment with a new mortgage that is now worth $1,006,135.82 in breach of the Agreement. Pl.'s Stmt. Facts ¶¶ 26-27 (document #78).

The Perry Parties, however, contest the current value of this mortgage, have accused AFFI of misrepresenting the facts to the court, and have provided supplemental documentation to show that the mortgage is offset by sums embroiled in separate litigation. See Pl.'s Stmt. Facts Ex. A (document #78-1). This factual dispute highlights the triable issue of fact about the value of the mortgage and indeed whether there was a breach and misrepresentation of facts.

Similarly, AFFI alleges that the Perry Parties misrepresented that there was no "oil contamination, hazardous waste or other hazardous materials" that materially affected the value of the 300 Canal Street property, a statement that they knew to be false and upon which AFFI relied to its detriment. They bring claims of waste, fraud, misrepresentation and deceit based upon these allegations. And they also charge breach of contract for the Perry Parties' failure to remove an EPA lien on the property in the amount of $545,365.07. The Settlement Agreement included a provision that required the Perry Parties to take "all steps necessary to remove or dissolve any lien placed on [300 Canal Street]." Settlement Agreement at 4 (document #1-5).

The Perry Parties have countered, however, that the representations that they made at the time of the Agreement were true. Since then, they have had a tenant on the property, Bay State, and that the EPA violations resulted from Bay State's activities. Bay State has since abandoned and surrendered the premises, and the Perry Parties are in the process of removing the EPA lien and seeking recourse against Bay State. There is, therefore, a triable issue of fact as to the circumstances surrounding the EPA lien and the Perry Parties efforts at removing it. The Settlement Agreement states only that the Perry Parties "take all steps necessary" to remove liens, not that they do so instantaneously. It is certainly not immediately clear that they knowingly misled the FDIC about the state of the property at the time of the Settlement Agreement.

Summary judgment on Defendant's Counterclaim Counts I-IV is therefore **DENIED.**

F.     **Costs & Fees (Def's Counterclaim VI)**

Finally, AFFI moves for summary judgment under Mass. Gen. Laws. ch. 231 §6F on its claim for reasonable costs, including attorney fees, incurred in litigation against a party who has advanced insubstantial, frivolous or bad faith claims or defenses.  Such a determination may be made after a motion and hearing.  AFFI alleges that the plaintiff's claim that the FDIC agreed to forbear beyond 90 days is plainly frivolous and made in bad faith.  That same argument could be made of AFFI's own allegations of fraud and misrepresentation.  Accordingly, I **DENY** AFFI's Motion for Summary Judgment on Costs and Fees.

III.     **CONCLUSION**

For the reasons stated above, I **GRANT** Defendant's Motion for Partial Summary Judgment (document #54); and I **GRANT in part and DENY in part** Defendant's Motion for Summary Judgment (document #63).


**SO ORDERED.**

**Date:  December 21, 2010**          /s/ Nancy Gertner
                                      **NANCY GERTNER, U.S.D.J.**